56   256
186   576

# The Eureka Insurance Company *versus* Robinson, Rea & Co.

1. An insurance made without issuing a policy is to be regarded as made upon the terms and subject to the conditions in the ordinary forms of policies used by the company at the time.

2. A company was authorized to make marine and fire insurances ; there was a clause in their fire policies, that unless notices of other insurances were given with diligence and endorsed on the policy, or otherwise acknowledged in writing, the policy should be void ; in the marine policies, that the policy

[Eureka Insurance Co. *v.* Robinson.]

should become void if further insurance should be made, unless notice was given at the company's office and approved and endorsed, &c. It was incumbent on the insured to show that notice of another insurance had been given, or that the company had dispensed with it, notwithstanding no policy had been issued.

3. The secretary of an insurance company testified that neither he nor the company, so far as he knew, had notice of a second insurance: he could not be asked, "As the executive officer of the Eureka Insurance Company, would you have consented to an additional insurance in the Monongahela or other insurance company, and if not, why?"

4. Declarations of a person, not a party, in writing or otherwise, that he was part owner of the vessel insured, for the purpose of showing his ownership and that he had wilfully caused the fire, *held* to be inadmissible.

5. No policy having been issued, nothing more could be required in case of an additional insurance than notice at the office of the company.

6. An insurance was effected, and afterwards another in a different company,—subsequently the first company agreed to the transfer of the policy for the use of the creditors of the insured, on condition of their becoming responsible for the premium. The court affirmed the following point of the plaintiffs: "If the jury believe that prior to and at the time of making the contract whereby the loss was made payable to the plaintiffs for the benefit of the creditors, the defendants had actual knowledge of the additional insurance in the Monongahela office, they cannot set up such additional insurance to defeat a recovery by the plaintiffs." *Held*, not to be error.

7. The boat insured was burned, the wreck was sold under an attachment by creditors, and the proceeds brought into court: the amount of the insurances and the money in court would not reach the loss. *Held*, that the insurance company was not entitled to credit for any part of the money in court.

8. The arrangement transferring the policy for the benefit of the creditors was not a new contract in place of the original contract, limiting the liability to the interest of the creditors; the company were still liable for the whole amount of insurance.

9. Where the hazard is fire alone and the subject is an unfinished vessel, never afloat for a voyage, and not a subject for marine insurance, a contract to insure must be regarded as a fire risk.

November 11th 1867. Before THOMPSON, STRONG, READ and AGNEW, JJ. WOODWARD, C. J., absent.

Error to the Court of Common Pleas of *Allegheny county :* No. 22, to October and November Term 1867.

This was an action of assumpsit, by Robinson, Rea & Co., against the Eureka Insurance Company, on a contract of insurance without a policy issued. The company was authorized to make both fire and marine insurances. The entry of the insurance on their "Marine Docket" was as follows:—

"No. 6570, 1865, June 23d, Wm. H. Churchill, for account, &c., (on) steamboat 'River Queen,' $6000. Total insurance inclusive, $12,000, against fire only, while finishing at the wharf at Pittsburg, Pa., (rate) ½ per cent. per mo., from June 23d 1865."

There was entered also on the same docket: "August 1st 1865, 'Loss, if any, payable to Robinson, Rea & Co., for benefit of creditors;'" and in pencil, "Burned, Sept. 10th 1865."

6 P. F. SMITH—17

[Eureka Insurance Co. *v.* Robinson.]

The plaintiffs' affidavit of claim stated that Churchill was the agent for the owners, J. H. & H. B. Hebert; that on the 19th of July 1865 the steamboat was libelled in the District Court of Allegheny county by creditors, and seized by the sheriff; that the plaintiffs were creditors and libellants, and on the 1st of August 1865 it was agreed between the owners, the insurance company (who then knew of the seizure by the sheriff) and the plaintiffs, that a loss, if any, should be paid to the plaintiffs, for the creditors, the plaintiffs agreeing to become responsible for the premiums; that the steamboat, whilst being finished, was, on the 10th of September 1865, burned to the water's edge; that by order of the District Court the wreck of the boat was sold by the sheriff, and produced the net sum of $6878.76, which was paid into court; that the claims filed against the boat and allowed by the court amounted to $14,659.88; that the value of the boat was above $25,000; that immediately after the loss the defendants denied their liability, on the ground of another insurance for $6000 on the boat in the Monongahela Insurance Company, made July 20th 1865, of which the defendants had no notice, but the plaintiffs averred that the defendants had notice of the latter insurance before the 1st of August 1865, the date of the arrangement with the plaintiffs for the creditors. In their affidavit of defence, besides grounds of legal defence, the defendants averred that from the date of the insurance to the loss, the owners of the boat were the Heberts, Churchill, —— Minor and Wm. C. Champlin, and that Champlin wilfully set fire to the boat; that Champlin, after the insurance by the defendants, had insured his interest for $2000 in "The Cash Insurance Company," and had given the defendants no notice; that an insurance for $6000 on the boat before defendants' insurance had been effected in The Citizens' Insurance Company, of which they had notice, and one for a like sum in the Monongahela Company, after their insurance, of which they had no notice.

The three insurances were admitted to have been made as follows:—

1865, May 22d, Citizens' Insurance Company.
  "  June 23d, Eureka Insurance Company.
  "  July 20th, Monongahela Insurance Company.

The following clause is in the fire policies of the defendants:—

"Unless notices of all other insurances upon property hereby insured shall, with reasonable diligence, be given by the assured, and endorsed upon this policy, or otherwise acknowledged in writing by the company, this policy shall be void."

In their marine policy there is a clause of this form:—

"This policy shall become void if any further insurance has been or hereafter shall be made on the said [steamboat] which together with this insurance shall exceed the sum of [$12,000]

dollars, or upon assignment thereof unless notice is given at the office of the company, and the same be approved and endorsed hereon by the secretary, or other authorized officer of the company."

The plaintiffs gave evidence, by James Atkinson, that he was agent of The Citizens' Insurance Company in 1865 ; that the insurance on "The River Queen" in that company, and in the Eureka and Monongahela companies, were effected through him ; that when he took in the risk in the Monongahela Company, he could not say that he notified the Eureka of the risk ; that it was his custom to do so, to avert any future trouble.

The plaintiffs then proposed the following question to the witness :—

"You have stated that it was your custom to give notice ; state whether or not it was your custom to do so in a case like the present, viz., where you had effected an insurance in one office and subsequently a new or additional risk in another ?"  The question was objected to by the defendants, admitted by the court, and a bill of exceptions sealed.

The witness said :—"I think it was ; I was always careful to have everything of this kind attended to, so that there would be no trouble afterwards. I got the risk from the captain of the boat, and then distributed it among the three offices. I cannot say whether in this particular instance I notified the Eureka office of the subsequent risk in the Monongahela."

John H. Stewart, the sheriff of the county, testified : "After the writ against the 'River Queen' came into my hands, at the request of the attorneys, I went to the office of the Eureka Insurance Company. I found W. G. Miller there in charge of the office. I told Mr. Miller that I desired to have an insurance on the steamboat River Queen of $15,000. Mr. Finney was not there. We had considerable conversation on the subject. Came to no definite understanding about it. Mr. Miller was writing and making memoranda, as if he was going to make out a policy. He then looked at a book, and said, 'hold on a little bit,' and he started and went out of the office—he came back, and informed me that they could not take a risk on the boat, stating that the owners had her insured already for $18,000, $6000 of which was in their office, $6000 each in two other offices. I asked him if he would tell me the names of the offices, and he put them down on a slip of paper and gave them to me.   *   *   *   I know that the name of the Eureka Insurance Company was on the memorandum, and I think that of 'The Citizens' also, but as to the third I cannot remember."

Churchill testified that Champlin had no interest in the boat when she was burned.  He was to have an eighth interest after her completion upon payment of his share of her cost.  That

never was paid. They gave evidence also that the boat had cost $32,145; that the Heberts were negotiating a sale for $30,000, and that they would be losers to the extent of $14,000 or $15,000 after they should have got the insurance.

For the defendants, Robert Finney, their secretary, testified that when the boat was attached, and in the hands of the sheriff, the plaintiffs, in the office of the Citizens' Company, requested him to transfer the insurance to them, for the use of themselves and other creditors; that he consented on condition they would be responsible for the past and further premiums; that the plaintiffs agreed to the condition, and he made a record of the transaction. He further testified:—"I never had personally any notice of any additional insurance in the Monongahela Insurance Company, nor had the company any notice that I know of until after the loss occurred. I am the only one who has power to insure or accept notice of additional insurances in other companies for the Eureka Insurance Company. In case of my absence a committee has power to direct insurances to be taken. Mr. W. G. Miller is a clerk in the Eureka Insurance Company. He has no power to make contracts to bind the company in any way."

The defendants then proposed to ask the witness this question:—" As the executive officer of the Eureka Insurance Company, would you have consented to an additional insurance of $6000 on the River Queen in the Monongahela Insurance Company, or any other company, and if not, why?" The question was objected to by the plaintiffs, rejected by the court, and a bill of exceptions sealed.

The defendants then called W. G. Miller, who testified:—" Am clerk in the Eureka Insurance Office; was there in summer of 1865. There is no note or memorandum on the books or papers of the company of an insurance on the River Queen in the Monongahela Insurance Company—was none in summer of 1865. Never was any notice served on me of any such insurance, nor on any one that I know. In summer of 1865 Mr. Finney and I were the only persons employed in the office of the company, except a small office-boy. I remember the visit of Sheriff Stewart to the office. He said he wanted to insure the 'River Queen,' to protect himself. I told him she was already insured for $12,000. I went into the Citizens' office to inquire whether the insurance already on the boat could be transferred to the sheriff; and while there, accidentally learned through Capt. Atkinson that there was an additional insurance of $6000 on the boat in the Monongahela Insurance Company. I returned and informed the sheriff that I had heard a matter that was entirely new to me—an insurance of $6000 in the Monongahela Insurance Company. I turned to our marine docket, and satis-

fied myself that we had an account of but $12,000 there—$6000 in our own office, and $6000 in the Citizens'. As the sheriff was about going away he asked me for a memorandum of the companies in which the boat was insured. I gave him a memorandum of the three. I take no insurances—merely take a memorandum, and submit the same to Mr. Finney. I do receive notices of additional insurances, but communicate the same to Mr. Finney for his action. I never told Mr. Finney of what I had learned in relation to insurance on the boat in the Monongahela Insurance Company, nor to the business committee. Never mentioned it to either of them.

"The offices of the Citizens' and Eureka Insurance companies are in Bagaley's Building, on the same floor, doors just opposite each other."

The defendants also gave in evidence that the Cash Insurance Company, on the 21st of July 1865, took a finishing risk of $2000, for W. C. Champlin, on his one-eighth in the boat, and proposed to prove that insurance No. 3492, by Citizens' Insurance Company on "River Queen," May 22d 1865, to Capt. W. H. Churchill, on account of boat and owners, &c., was assigned Aug. 1st 1865, by Wm. C. Champlin, as follows:—

"August 1st 1865, loss, if any, payable to Robinson, Rea & Co., for the benefit of the creditors.

"For the boat and owners,        Wm. C. Champlin."

Offered for the purpose of showing ownership in W. C. Champlin, and a recognition of that ownership by the plaintiffs in this case ; to be followed by record of an indictment in the Court of Quarter Sessions of Allegheny county, No. 392, October Term 1865, Commonwealth v. William C. Champlin, for arson in burning the boat, to which he pleaded guilty, and was sentenced to the penitentiary ; also the record of a suit by the plaintiffs against the Citizens' Insurance Company for the insurance by them before referred to.

The offer was rejected by the court, and an exception taken.

They then offered the assignment, and the two records separately. These also were rejected, and bills of exception sealed.

They then proposed to prove the declarations of Wm. C. Champlin, while in charge of the boat, that he, Champlin, was an owner thereof ; these declarations, made before there was any insurance on the boat, and repeated at different times until the destruction of the boat, and afterwards, to be followed by the record of the Court of Quarter Sessions (heretofore offered), and repeated acknowledgments of Wm. C. Champlin that he burned the boat. This offer was rejected, and an exception noted.

The 3d and 4th points of the plaintiff, with the answers of the court were :—

3. " If the jury believe from the evidence, that prior to, and at

the time of making the contract of August 1st 1865, whereby the loss was made payable to the plaintiffs for the benefit of the creditors, the defendants had actual knowledge of the additional insurance in the Monongahela office, they cannot set up such additional insurance to defeat a recovery by the plaintiffs."

Answer : " This point is affirmed."

4. " If the jury believe from the evidence, that it was part of the duty of W. G. Miller, as clerk of the defendants, to receive notices for said defendants of additional insurances, and report thé same to the secretary, and this was the course of business in said office ; and that Capt. Atkinson notified said Miller of the additional risk taken in the Monongahela company, under the circumstances stated by the witness Miller, it is immaterial that such notice was given in the office of the Citizens' Company instead of the defendant's office.

Answer : " This point is affirmed, if the jury is satisfied from the evidence, that notice of the additional insurance in the Monongahela Insurance Company was given by Capt. Atkinson to Mr. Miller, in such a way as to indicate that it was intended as a compliance with the provisions of the policy ; but if the fact of additional insurance was merely spoken of incidentally in the course of an ordinary conversation, it would not amount to such notice as is contemplated by the provision of the policy, and such as the clerk would be required to communicate to the officers of the company. What a secretary or clerk of an insurance company may accidentally learn while out of the office, cannot be treated as notice that will bind the company. Notice, to be effectual, should be given in such a way as to indicate that it is intended as a compliance with the contract of insurance—to be recognised and acted upon by the proper officer of the company."

The 2d and 3d points of the defendants were as follows :—

2. That there is in this whole case no sufficient evidence of the notice and assent, required by the terms of the contract ; and that for want of this the plaintiffs cannot recover.

3. That if the jury find that plaintiffs are entitled to recover on the other grounds, then they must make up their verdict for the amount insured less the premium $90 ; and credit defendants for *one-third* of $6047.19, made by sheriff on sale of wreck, $2015.73.

Both points were denied.

The court (Sterrett, P. J.) also charged :—

" This being a condition of the contract, it was the duty of the insured to notify the company (defendants) of the risk subsequently taken in the Monongahela Insurance Company, and neglect on their part to do so will prevent a recovery against the company. Whether such notice was given or not, is a question of fact for you to determine from all the evidence before you."　　*　　*　　*

[Eureka Insurance Co. *v.* Robinson.]

" Again, if at the time the insurance was marked payable to the plaintiffs, and they assumed the payment of the premium, t¹ c company (defendant) knew of the existence of the risk in the Monongahela office, no proof of further notice or assent would be necessary in order to entitle the plaintiffs to recover. Under such circumstances the company would be estopped from setting up want of notice, as provided for in the condition of the policy already referred to."

The verdict was for the plaintiffs for $6350.

The defendants took out a writ of error, and assigned for error the rulings of the court on the admission and rejection of evidence as contained in the several bills of exception, the answers to the points and the portions of the charge given above.

*J. Veech & Son* and *T. M. Marshall,* for plaintiffs in error, referred to Klein *v.* Franklin Fire Ins. Co., 1 Harris 249 ; Carpenter *v.* Prov. Washington Ins. Co., 16 Pet. 495 ; s. c. 4 How. 185 ; Barrett *v.* Union Ins. Co., 7 Cush. 175 ; Forbes *v.* Agawam Ins. Co., 9 Id. 470 ; Pendar *v.* American Ins., Co. 12 Id. 469 ; Worcester Bank *v.* Hartford Fire Ins. Co., 11 Id. 265 ; 4 Zabr. (N. J.) 447 ; 21 Mo. 99 ; 6 Gray 169 ; 8 Id. 33 ; 17 N. Y. 609 ; Simpson *v.* Penna. Fire Ins. Co., 2 Wright 255 ; Dean *v.* Fuller, 4 Id. 474 ; Moore *v.* Patterson, 4 Casey 505 ; De France *v.* De France, 10 Id. 385 ; 2 Pars. on Mar. Law 335-6 ; 2 Phil. on Ins. pl. 1714 ; 1 Pars. on Cont. 201.

*M. W. Acheson,* for defendants in error, referred to Buckley *v.* Garrett, 11 Wright 204 ; Western Ins. Co. *v.* Cropper, 8 Casey 351 ; Simpson *v.* Penna. Fire Ins. Co., 2 Wright 250 ; Coursin *v.* Penna. Ins. Co., 10 Id. 323 ; West Branch Ins. Co. *v.* Helfenstein, 4 Id. 289 ; Franklin Fire Ins. Co. *v.* Updegraff, 7 Id. 350 ; Penna. Ins. Co. *v.* Bowman, 8 Id. 89 ; Atlantic Ins. Co. *v.* Goodall, 35 N. H. 328 ; Danville Bridge Co. *v.* Pomeroy, 3 Harris 151 ; Inland Ins. & Dep. Co. *v.* Stauffer, 9 Casey 403 ; Lycoming Ins. Co. *v.* Schollenberger, 8 Wright 259 ; Ins. Co. *v.* Slockbower, 2 Casey 199 ; Brown *v.* Commonwealth Ins. Co., 5 Wright 187 ; Phillips *v.* Merrimac Fire Ins. Co., 10 Cush. 350 ; Macomber *v.* Cambridge Ins. Co., 8 Id. 135 ; State M. Fire Ins. Co. *v.* Roberts, 7 Casey 443 ; Parsons' Mercantile Law 537-8, 488 ; Angell on Fire Insurance, § 7, p. 43, § 249 ; Trull *v.* Roxbury M. Ins. Co., 2 Cush. 267-8 ; Liscom *v.* Boston M. Ins. Co., 9 Met. 211 ; Sloat *v.* Royal Ins. Co., 13 Wright 20.

The opinion of the court was delivered, November 21st 1867, by
STRONG, J.—The plaintiffs in the court below sued upon a contract of insurance, the evidence of which was an entry in the marine docket of the defendants as follows : " No. 6570, 1865,

June 23d. William H. Churchill for account, &c., on steamboat River Queen, $6000. Total insurance inclusive, $12,000, against fire only, while finishing at the wharf at Pittsburg, Pennsylvania. Rate ½ per cent. per month from June 23d 1865."

Afterwards the following entry was made : "August 1st 1865. Loss, if any, payable to Robinson, Rea & Co. for benefit of creditors." "Burnt September 10th 1865." No policy was ever issued. At the time when the first entry was made there was an existing insurance for the same amount, effected in the same manner, in the office of the Citizens' Insurance Company. Subsequently, to wit, on the 20th of July 1865, there was a similar insurance for a like amount made in the office of the Mononga- hela Insurance Company. All these insurances were effected through Captain Atkinson, who had been acting as agent for the Citizens' Insurance Company. There having been no policy issued, and nothing more than the memorandum above quoted entered upon the docket of the insurers, the contract is to be regarded as made upon the terms and subject to the conditions contained in the ordinary form of policies used by the company at the time. Whether the contract in this case was one of marine insurance or of fire insurance, it is not necessary at this stage of our remarks to determine. The company was authorized to issue policies of both descriptions, and alike in the customary forms of both, it was made the duty of an assured to notify the insurers of any insurance subsequently obtained elsewhere, on penalty of forfeiting all right to recover against this company. In fire policies such notice was required to be given with reasonable diligence, and endorsed upon the policy, or otherwise acknow- ledged in writing by the company. In marine policies the form required the notice to be given at the office of the company, and that the same be approved and endorsed upon the policy by the secretary or other authorized officer of the company. As the defendants in fact issued no policy in either form in this case, literal compliance with the conditions was impossible. But it was doubtless incumbent upon the plaintiffs to show either that notice of the subsequent insurance in the Monongahela Insur- ance Company was given, or that these defendants had in some way dispensed with it. On the trial the plaintiffs accepted this obligation, and called as a witness Captain Atkinson, who, after testifying that he was an agent for the Citizens' Insurance Company in 1865, that he effected the three insurances of the steamboat, that he could not say whether he notified these de- fendants of the risk in the Citizens', or that he notified them of the risk when he took it in the Monongahela, added, "it was my custom to do so to avert any future trouble." He was then asked "Whether it was his custom to do so in a case like the present, viz., where he had effected an insurance in one office,

[Eureka Insurance Co. v. Robinson.]

and subsequently a new or additional risk in another ? To this question the defendants objected, but the court allowed it to be put, and sealed a bill of exceptions.

The witness then proceeded to testify that such was his custom, that he was always careful to have everything of this kind attended to, so that there would be no trouble afterwards, though he could not say whether in this particular instance he notified the Eureka office of the subsequent risk in the Monongahela.

In Schoneman v. Fegely, 2 Harris 376, it appeared that in the court below a witness had testified that he did not know whether he gave a receipt for the amount of a note received by him. He was then asked, " Did you not usually give receipts for notes received ?" The question was overruled, and on removal of the case to this court, Bell, J., said, " the fact sought to be established could not be proved by evidence of a general practice after the witness had disclaimed knowledge in the particular instance." He added, however, " that if any error was committed (in rejecting the question), it was cured by something else in the trial." This, though an intimation, ought not to be considered of much authority. It is evident that the matter was regarded of no importance, as in truth it was in that case. No reasons were given for Judge Bell's remark and no authority in support of it was cited. We think it not uncommon in practice to corroborate the defective memory of a witness by proof of what was his habit in similar circumstances. Thus a subscribing witness to a will or a bond, if unable to recollect whether he saw the testator or obligor sign the instrument, or heard it acknowledged, is often permitted to testify to his own habit, never to sign as a witness, without seeing the party sign whose signature he attests or hearing that signature acknowledged. And it seems to be persuasive and legitimate *supporting* evidence.

The difficulty in this case is that the witness, when asked the question, had given very little, if any, evidence tending to show notice of the additional insurance in the Monongahela, and hence, to say the least, it is doubtful whether there was anything to be corroborated by an answer to the question propounded. And were it not for what was subsequently proved, we should probably feel it our duty to sustain the exception. But it was testified by another witness that on the very day when the new risk was taken by the Monongahela, the defendants acquired knowledge of it in some way. A person in their office habitually, and left in charge of the office in the absence of the secretary, a person who testified that he did receive notices of additional insurance, on that day told the sheriff, who applied for other insurance, that the River Queen was already insured in three offices, $6000 in each. It is true that when this clerk afterwards came to testify for the defendants, he stated that he acquired this knowledge from the Citizens'

company and not from the assured. This was not until after the plaintiffs had closed in chief. As the case stood at that time, we think the answer of Captain Atkinson to the question put to him was corroborative of an inference fairly to be drawn from the testimony of the sheriff that the defendants having knowledge of new risk taken, had acquired it from the assured. If so, though the question may not have been admissible when it was proposed, the answer to it became proper evidence before the plaintiffs closed their case. At all events the error, if any, is not sufficiently manifest to justify us in reversing the judgment because of this exception, especially as it is quite plain compliance with the condition to give notice was waived, if the evidence is to be believed, and, therefore, the answer given by the witness became immaterial.

The 2d exception grew out of the following state of facts. The defendants called Robert Finney, their secretary, who, after stating that he personally never had any notice of any additional insurance in the Monongahela, and that the company had no notice, so far as he knew, until after the loss occurred, was asked whether "as executive officer of the company he would have consented to an additional insurance of $6000 in the Monongahela, or any other company, and if not, why?" The question was objected to and overruled, the defendants excepting. What was sought from the witness was the opinion entertained by him at the time of the trial, and his reasons for that opinion. It is not perceived upon what principle this should have been admitted. Had the inquiry been after facts existing when the new insurance was taken, facts that rendered it improbable consent would have been given, a different question would have been presented.

The 3d, 4th and 5th exceptions may be considered in connection with each other. They relate to evidence offered by the defendants and rejected by the court, for the purpose of showing that the steamboat belonged in part, at least, to William C. Champlin, and that he had wilfully caused the fire. The purpose was quite legitimate, but the evidence offered had no tendency, so far as we can see, to establish that Champlin had any ownership of the boat. Certainly no legitimate inference of such ownership can be drawn from Champlin's own declarations whether in writing or not. So far from the fact that the memorandum of insurance in the Citizens' Insurance Company and the transfer signed "For the boat and owner William C. Champlin," proved an acknowledgment of property in him by the plaintiff, the fair inference from it, if any can be drawn, is directly the contrary. These exceptions are, therefore, not sustained.

The 6th, 7th and 11th assignments of error are founded upon exceptions to the charge of the court. It is insisted that in the instruction given to the jury the court misled them by confounding

mere *knowledge* by the defendants of additional insurance, no matter how acquired, with that *notice* which the assured was under obligations to give. Had the contract been evidenced by a policy actually issued, we have seen its conditions would have required that notice should be given to the company of any additional insurance, and that the same should be approved and endorsed on the policy, or otherwise acknowledged in writing. The approval and endorsement of approval in the manner stated were rendered impossible by the failure of the company to make out a policy. And if they would avail themselves of the want of complete performance of a condition existing only for their benefit, it was their duty to make complete performance possible, or at least, by no act or default of their own, interpose obstacles in the way of performance. Hence, nothing more was required by this contract than notice, perhaps notice at the office of the company. Certainly this is so, if it is to be regarded a contract of marine insurance. It is true the form for a fire policy required notice of other insurances to be given by the assured and endorsed on the policy " or otherwise acknowledged in writing by the company."

If, then, this is to be treated as a contract of fire insurance, and if it is, as contended, the duty of an insured to procure the endorsement of notice on the policy or other written acknowledgment, he has an option of which the insurers cannot deprive him by withholding a policy. We repeat, therefore, that all the defendants had a right to under the condition we are now considering, was notice of additional insurance and perhaps, if it was a marine contract, notice at the office of the company. To such notice they had a right.

Let it be conceded, now, that mere knowledge of the defendants that other insurance had been effected in the office of the Monongahela Insurance Company was not the notice demanded, nor equivalent to it, the court did not instruct the jury that it was. Neither in the answer to the plaintiff's 3d and 4th points, nor in that portion of the general charge to which exception is taken, is any such doctrine to be found. This will be readily seen by reference to the points themselves, especially the 3d, which the court affirmed. The point was, " that if the jury believe from the evidence that prior to and at the time of making the contract of August 1st 1865, whereby the loss was made payable to the plaintiffs for the benefit of the creditors, the defendants had actual knowledge of the additional insurance in the Monongahela office, they cannot set up such additional insurance to defeat a recovery by the plaintiff."

The point and the answer had reference not to the identity in. effect of knowledge and notice, but to the effect of the new contract of August 1st, made with knowledge of the new insurance.

[Eureka Insurance Co. *v.* Robinson.]

So also the answer to the 4th point, and the general remarks referred to in the charge. Now, if it be, as has often been decided, that such a condition in a policy, introduced as it is for the benefit of the insurers, is waived when they, with full knowledge that other insurance has been obtained, continue to treat the contract as existing in force, it was right to instruct the jury that after the 1st of August 1865, it was not permissible for these defendants to set up in discharge of their undertaking, that notice had not been given to them of the new risk taken in the Monongahela office. It was not that knowledge was equivalent to notice, but that knowledge followed by acts that amounted to a subsequent recognition of the contract as still in force dispensed with the necessity of proving notice.

On the 1st of August 1865, if no notice had been given of the Monongahela office insurance, the contract of these defendants was at their mercy. They might have treated it as null and void. But on that day they recognised it as in continued force, by promising to pay the loss, if any, to the plaintiffs, receiving from them an undertaking to pay the premium. If at that time they knew that $6000 had been insured in another office, though they had received no formal notice of it, their act amounted to consent that failure to give it should not avoid the contract. This is in substance what was said by the learned judge of the court below, and we think correctly. These assignments of error are therefore not sustained.

The remarks just made are sufficient to indicate why we think there is no foundation for the 8th and 10th assignments. If what we have said be correct, it would have been a mistake to withdraw the case from the jury, because there had been no sufficient evidence of the notice and assent originally required by the terms of the contract.

The only remaining assignment raises the question whether the defendants were entitled to credit for a part of what is called salvage. After the fire by which the boat was destroyed, under legal process set in motion by the creditors of the owners, the remnants of the boat were sold, and the proceeds of sale ($6878.76) were paid into the District Court. It is with one-third of this sum that the defendants claim they ought to be credited, one-third only, because the aggregate of insurance by themselves, the Citizens' and the Monongahela companies was $18,000. It is not denied that the loss exceeds the sum total of all the insurances, but it is said as the plaintiffs hold the contract for creditors of the owners, they can recover no more than a sum sufficient with what the creditors have realized from the sale of the remnants, to pay the debts due them, and therefore the sum paid into court is to be taken into consideration. It is said the claims of the creditors amount to no more than about $14,000, and hence no

more than the excess of that sum over 6878.76 can be recovered on all the three contracts of insurance. This, if it has any foundation, must rest upon the assumption that, by the agreement of August 1st 1865, only the creditors' interests were insured ; that it was not only a new contract, but a substitute for the original contract of insurance. But this is a mistake. What the company undertook on the 1st of August was to pay the loss on the boat, not merely the loss sustained by the creditors from its destruction. The subject of the insurance remained unchanged, and so did the stipulated premium. Whether the creditors were paid or not, therefore, the duty of the defendants was to pay the loss on the boat so far as the sum insured by them reaches.

Again, it is said the contract was one of marine insurance, and therefore the loss being a constructive total one, the insurers are entitled to the salvage. Undoubtedly, it is a rule in marine insurance, in cases of total loss and abandonment, if the salvage or any part of it has been received by the assured, or applied to his use, the value of what has thus been received or applied, is to be deducted in adjusting the amount to be recovered from the underwriters, for they pay the value of the subject as agreed upon in the policy. This results from the general principle that a contract of insurance is one of strict indemnity. But if in such a case as this, when the insurance is only partial (that of the defendants being for $6000, and the total in three offices $18,000, while the value of the steamboat at the time of the loss was not less than $25,000), the contract would not be one of indemnity if the insurers can deduct anything on account of the salvage. And no authority justifies such a deduction. The rule as cited from Phillips on Insurance, and Parsons on Contracts, is a rule for another class of cases. It applies only when there has been an abandonment, or the whole value has been insured. It would be strange indemnity in a case of insurance of $10,000 on a ship valued at $20,000 or worth that sum, if on a loss by the perils insured against of $11,000, the salvage of $9000 can be deducted from the $10,000 insured, and thus the insurers be held liable for only $1000. But this is not a case of marine insurance. The fact that the memorandum was entered in the defendants' marine docket does not determine the nature of the contract. The risk taken was a finishing risk on a steamer at a landing, and it was taken against fire only. True, fire is one of the perils that may be insured against in a marine policy. But when the hazard is fire alone, and the subject is an unfinished vessel never afloat for a voyage, and therefore not properly the subject of marine insurance, the contract to insure must be regarded as a fire risk, certainly in the absence of an express agreement that it shall have the incidents of a marine policy. If, then, the con-

[Eureka Insurance Co. *v.* Robinson.]

tract of the defendants was one of fire insurance, there can be no question respecting the salvage in this case.

The judgment is affirmed.